## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No. 24-cr-20253-BECERRA(s)**
**18 U.S.C. § 1349**
**18 U.S.C. § 1347**
**18 U.S.C. § 1343**
**18 U.S.C. § 2**
**18 U.S.C. § 982(a)(7)**
**18 U.S.C. § 981(a)(1)(C)**

**UNITED STATES OF AMERICA**

**vs.**

**ANGELICA PACHECO,**

　　　　**Defendant.**

_____/

FILED BY_____ **BM** _____D.C.

**Jan 6, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Superseding Indictment:

### Drug and Alcohol Rehabilitation

1.　　Substance abuse treatment regulations described a continuum of care for patients experiencing substance abuse including, from most intensive to least intensive, detox, residential treatment, partial hospitalization ("PHP"), intensive outpatient ("IOP"), and outpatient ("OP"). The varying levels of treatment provided were based on the severity of a patient's addiction and the patient's current symptoms. Persons undergoing treatment on an outpatient basis, whether in PHP, IOP, or OP, often elected to live in a "recovery residence," also known as a "sober home," "halfway house," or in some cases "community housing," with other persons who were also in

treatment and committed to a drug- and alcohol-free lifestyle. While these terms for the residences are commonly interchanged, they are referred to herein as "sober homes."

2. The Florida Department of Children and Families ("DCF"), which regulated and licensed treatment facilities in Florida, referred to PHP as Day or Night Treatment with Community Housing. Unlike IOP or OP patients who elected to live in a recovery residence (also known as a "sober home") and were required to pay their own rent or room and board, in a Day or Night Treatment with Community Housing (or PHP) program, room, board, and transportation were provided by the program.

3. Detox facilities assisted patients in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. In cases where detox was necessary, patients who successfully completed detox or other inpatient services then received treatment for their underlying addiction in the form of outpatient care, through either PHP, IOP, and/or OP programs. However, not all patients required detox before attending outpatient care.

4. PHP, IOP, and OP patients attended facilities on an ongoing basis where treatment was rendered, generally in the form of group and individual therapy sessions. The distinction among the three different treatment plans related to, among other things, the amount of therapy time provided on a daily or weekly basis.

5. Medical and osteopathic doctors played an essential role in substance abuse treatment. Without a doctor, patients at the substance abuse treatment centers would not have received prescriptions for drugs, received treatment, or had urine, blood, or other bodily fluid testing. Bodily fluid tests, which were prescribed by the doctors, were billed to health plans by the substance abuse treatment centers and/or laboratories, as were patient evaluations performed by a physician.

6. DCF licensed and oversaw substance abuse treatment centers that provided detox, other inpatient treatment, PHP, IOP, and OP programs in Florida. Florida state regulations governed substance abuse treatment services, including standards for detox, other inpatient treatment, PHP, IOP and OP. *See, e.g.*, Fl. Admin. Code §§ 65D-30.006, 65D-30.007, 65D-30.0081, 65D-30.0091 and 65D-30.010. One of the requirements that DCF placed on certain facilities was that they have a medical director.

7. In Florida, substance abuse treatment services were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), Fl. Stat. § 397.301. Under the Marchman Act, private substance abuse service providers' policies regarding payment for services had to comply with federal and state law. Fl. Stat. § 397.431.

8. All "clinical treatment" under the Marchman Act was required to be "a professionally directed, deliberate, and planned regimen of services and interventions that [were] designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle." Fl. Stat. § 397.311(26)(a).

9. The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA") also promulgated guidelines for varying levels of treatment based on the severity of the addiction, including detox and IOP.

10. The American Society of Addiction Medicine ("ASAM") was a professional medical society representing over 6,000 physicians, clinicians, and associated professionals in the field of addiction medicine. ASAM published the ASAM Criteria, which was a collection of objective guidelines that gave clinicians a way to standardize treatment planning and the placement

3

of patients in a substance abuse treatment center, as well as how to provide continuing, integrated care and ongoing service planning, including for detox, PHP, IOP, and OP treatment services.

11.     The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.  With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

12.     The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

13.     Medical practitioners, such as physicians and nurse practitioners, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States.  21 U.S.C. § 822(b); 21 C.F.R. § 1306.03.  Upon application by the practitioner, the Drug Enforcement Administration ("DEA") assigned a unique registration number, also known as a "DEA number," to each qualifying medical practitioner, including physicians and nurse practitioners.

14.     One form of treatment for substance abuse involved the use of a prescribed controlled substance, buprenorphine, which was an opioid.  Buprenorphine was sometimes used in substance abuse treatment to wean opioid-addicted patients from opioids, including heroin and narcotic painkillers.  Because drugs containing buprenorphine were Schedule III controlled substances, meaning that there was a strong potential for abuse, resulting in fatal and non-fatal

4

overdoses, prescribing physicians were also required to have two DEA registrations. The first registration was the standard "DEA number" referenced above that was required to prescribe any controlled substance. The second registration was a "DEA X-number," which was granted to a limited number of physicians with valid "DEA numbers," who had completed a training program on substance abuse treatment and fulfilled other regulatory requirements.

### Bodily Fluid Testing in Substance Abuse Treatment

15.     One monitoring strategy used by substance abuse treatment centers and medical professionals to detect recent drug or alcohol use by a patient was urine drug testing (and blood testing). There were two primary categories of urine drug testing: immunoassay testing (e.g., a drug screen or point of care ("POC") testing) and specific drug identification testing (e.g., definitive, or confirmatory, testing).

16.     POC urine testing involved collecting urine in a specific cup designed for testing. The specimen was analyzed using a color band or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs. POC tests typically cost between $5 and $10 and could be read easily by a layperson. This testing was convenient, and less costly, and the results could be read quickly. POC testing was the most common form of urine testing performed at treatment facilities. Drug screens that test for the presence of specific types of drugs could also be performed by external laboratories for additional costs.

17.     Definitive (or confirmatory) urine drug tests used gas liquid chromatography-mass spectrometry ("LCMS") and/or gas chromatography, or high-performance liquid chromatography, to analyze the urine specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their

5

metabolites. This testing was more precise, more sensitive, and detected more substances than other types of urine testing. Results of definitive testing took longer, and the tests were significantly more expensive than POC testing or drug screens; single urine specimens that underwent drug screen analyzers and LCMS testing at outside laboratories could be billed to insurance companies for thousands of dollars.

## Payment for Substance Abuse Treatment

18.    Insurance coverage for substance abuse treatment and urine and blood testing was available through a number of avenues, including, but not limited to, the following private insurance companies:  Aetna Health Management LLC and Aetna Life Insurance for Members ("Aetna"), Blue Cross/Blue Shield ("BCBS"), Cigna Healthcare ("Cigna"), United Behavioral Health and United Health Group, Inc. ("United"), and Optum Health ("Optum") (collectively, "Insurance Plans"). The Insurance Plans offered health care coverage directly to consumers and through employers. They also managed health care plans offered to federal employees. The Insurance Plans covered medical and clinical treatment costs of rehabilitation in accordance with the terms of their policies and state and federal law, including requirements that addiction treatment services and testing be medically necessary.

19.    Under the terms of insurance policies and consistent with state and federal law, the Insurance Plans were only responsible for claims for services that: (a) were medically necessary and actually rendered, (b) were provided by a properly licensed service provider, and (c) complied with the terms of the health care plans, including the obligation to pay co-insurance and deductibles.

20.    The Insurance Plans were "health care benefit program[s]," as defined in Title 18, United States Code, Section 24(b).

6

21.     Typically, health care providers, including substance abuse treatment facilities, laboratories, and medical professionals, submitted claims for substance abuse treatment and bodily fluid testing to the Insurance Plans electronically, via interstate wires.

**The Small Business Administration, the COVID-19 Emergency, and the CARES Act**

22.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 to provide emergency financial assistance to Americans suffering economic harms from the COVID-19 pandemic.  To achieve this goal, the CARES Act established new temporary programs and expanded existing programs administered by the United States Small Business Administration ("SBA").

**The Paycheck Protection Program**

23.     One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

24.     In order to obtain a PPP loan, a qualifying business submitted a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan, including that the business was in operation on February 15, 2020.  In the PPP loan application (SBA Form 2483), the small business was also required to provide, among other things, its (a) average monthly payroll expenses and (b) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation of their

7

payroll expenses. The PPP loan applicant was also required to affirmatively certify that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law."

25.     The CARES Act required PPP loan applications to be processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, were transmitted by the lender to the SBA in the course of processing the loan.

26.     PPP loan proceeds were required to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time and used a defined portion of the PPP loan proceeds on payroll expenses.

27.     SBA loan processors participated in the PPP by, among other things, acting as a service provider for small businesses and certain lenders.  Small businesses seeking a PPP loan could apply through the SBA loan processor, which would review the PPP loan application.  If a PPP loan application received was approved for funding, a partner financial institution disbursed the loan funds to the applicant.

### The Economic Injury Disaster Loan Program

28.     The CARES Act also authorized and provided funding to the SBA to provide Economic Injury Disaster Loans ("EIDL") to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic.  These COVID-19 EIDLs included the possibility of an advance of up to $10,000 for qualifying applicants.  The applicant was not obligated to repay this advance.

8

29.     In order to obtain a COVID-19 EIDL, a qualifying business was required to submit an EIDL application to the SBA and provide information about its operations, including the number of employees, gross revenues, and cost of goods sold for the 12-month period preceding January 31, 2020.  The applicant was further required to "review and check all of the following" statements, which included a statement that the "Applicant is not engaged in any illegal activity (as defined by Federal guidelines)."  If the applicant was "unable to check all of the" certifications, the "Applicant [was] not an Eligible Entity."  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

30.     EIDL applications were submitted directly to the SBA and processed by the SBA with support from a government contractor.  Prior to July 11, 2020, EIDL applications were submitted through three different servers, which were located in: Boydton, Virginia; West Des Moines, Iowa; or Quincy, Washington.  The amount of the loan, if the application was approved, was determined based, in part, on the information provided in the application concerning the number of employees, gross revenues, and cost of goods sold.  Any funds issued under an EIDL were issued directly by the SBA to the applicant's bank account.  EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

31.     Once an SBA EIDL application was approved, the SBA's Denver Finance Center, located in Denver, Colorado, created payment files and authorized payments of the EIDL funds based on those applications.  The disbursement of the EIDL funds were transmitted by the Financial Management System ("FMS") to the Treasury and then to the recipient's bank account via interstate wire. The primary server for the FMS is in Sterling, Virginia.  Upon approval of an application for an EIDL or cash advance grant, the SBA would disburse the funds.

### The Defendant and Relevant Entities and Individual

### The Treatment Programs

32.     Florida Life Recovery and Rehabilitation LLC ("Florida Life") was a limited liability company formed under the laws of Florida, with its principal place of business in Miami-Dade County.   Florida Life was a substance abuse treatment center licensed with DCF that purportedly provided PHP, IOP, and OP services to individuals, including individuals covered by the Insurance Plans.

### The Clinical Laboratories

33.     Lab 1 was a limited liability company formed under the laws of Florida, with its principal place of business in Broward County, Florida.

34.     Lab 2 was a limited liability company formed under the laws of Florida, with its principal place of business in Broward County, Florida.

35.     Lab 3 was a Florida corporation, with its principal place of business in Miami-Dade County, Florida.

36.     Lab 4 (together with Lab 1, Lab 2, and Lab 3, the "Clinical Laboratories") was a Pennsylvania corporation.

### Additional Entity

37.     Second Chance Detox, LLC (d/b/a/ Compass Detox) ("Compass Detox") was a limited liability company formed under the laws of Florida, with its principal place of business in Broward County.  Compass Detox was a substance abuse treatment center licensed with DCF that purportedly provided individuals with substance abuse treatment and services.

10

**Financial Institution**

38.     Lender 1 was a financial institution that participated as a lender in the Paycheck Protection Program.  Lender 1 was a "financial institution" within the meaning of Title 18, United States Code, Section 20.

**The Defendant and Relevant Individuals**

39.     **ANGELICA PACHECO**, a resident of Miami-Dade County, was a registered nurse, employee, and beneficial owner of Florida Life.

40.     Individual 1, a resident of Miami-Dade County, was the Medical Director for Florida Life.

41.     Individual 2, a resident of Miami-Dade County, was an owner of Florida Life.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     Paragraphs 1 through 21 and 32 through 40 of the General Allegations section of this Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

2.     From in or around July 2017, and continuing through in or around April 2021, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANGELICA PACHECO,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Individual 1, and others known and unknown to the Grand Jury:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent

11

pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.    to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by, among other things:  (a) submitting and causing the submission of false and fraudulent claims to health care benefit programs via interstate wire communications; (b) concealing the submission of false and fraudulent claims to health care benefit programs; (c) concealing the receipt of the fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, and the use and benefit of others, and to further the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      **ANGELICA PACHECO** and her co-conspirators established, operated, and controlled Florida Life, which was purportedly in the business of providing effective clinical treatment services for persons suffering from alcohol and drug addiction.

5.      To obtain and retain patients for Florida Life whose insurance—including the Insurance Plans—could be billed for substance abuse services, **ANGELICA PACHECO** and her co-conspirators offered and paid kickbacks and bribes in the form of money, gift cards, free interstate flights, allowing one patient to "piggyback" on another patient's insurance, and offering other "scholarships" in exchange for a patient referring other individuals with insurance (including individuals covered by the Insurance Plans).

6.      **ANGELICA PACHECO** and her co-conspirators entered into agreements with some of the owners of the Clinical Laboratories to send urine samples for comprehensive analysis in return for referring patients to Florida Life. **PACHECO** and her co-conspirators also entered into reciprocal referral agreements with other affiliated substance abuse treatment centers that involved recycling the same patients back and forth through the different treatment centers, regardless of whether doing so was medically necessary, so that they could continue to bill the Insurance Plans.

7.      In order to keep patients docile and incentivize them to attend and remain at Florida Life, **ANGELICA PACHECO**, Individual 1, and their co-conspirators prescribed, caused to be prescribed, administered, and caused to be administered to Florida Life patients, medications, including controlled substances, prescription medications, such as buprenorphine, and over-the-counter medications, in quantities and combinations that at times grossly diverged from legitimate medical practice, and which were intended to offer patients a substitute for a narcotic or alcohol-induced high.

13

8. **ANGELICA PACHECO**, Individual 1, and their co-conspirators billed and caused to be billed to the Insurance Plans PHP, IOP, and OP services for Florida Life patients. In many instances, patients did not attend the purported PHP, IOP, and OP sessions at Florida Life. The services were frequently not provided as billed, were so substandard that they failed to serve a treatment purpose, and/or were medically unnecessary.

9. **ANGELICA PACHECO**, Individual 1, and their co-conspirators created or caused to be created therapy notes for Florida Life falsely reflecting that therapy was actually provided when it was not.

10. **ANGELICA PACHECO**, Individual 1, and their co-conspirators billed and caused to be billed to the Insurance Plans PHP, IOP, and OP services for patients who were not in fact enrolled in treatment at Florida Life at the time.

11. **ANGELICA PACHECO**, Individual 1, and their co-conspirators also ordered and caused to be ordered excessive and expensive urine drug and bodily fluid testing for Florida Life's patients, regardless of whether such testing was medically necessary, or used in treatment.

12. **ANGELICA PACHECO**, Individual 1, and their co-conspirators submitted and caused others to submit, via interstate wire communications, approximately $15,406,913 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily substance abuse PHP, IOP, and OP services, were medically necessary, prescribed by a doctor, actually provided, and provided as billed by Florida Life to individuals covered by the Insurance Plans.

13. As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank accounts of Florida Life, in the approximate amount of $3,765,952.

14.     **ANGELICA PACHECO**, Individual 1, and their co-conspirators caused the Clinical Laboratories to submit, via interstate wire communications, approximately $3,729,732 in claims to the Insurance Plans which falsely and fraudulently represented that various health care benefits, primarily laboratory testing services such as definitive urine drug tests, were medically necessary and prescribed by a doctor to individuals covered by the Insurance Plans.

15.     As a result of such false and fraudulent claims, the Insurance Plans made payments to the corporate bank accounts of the Clinical Laboratories in the approximate amount of $520,462.

16.     **ANGELICA PACHECO**, Individual 1, and their co-conspirators used the proceeds of the fraud for their personal use and benefit, the use and benefit of others, and to further the fraud scheme.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-6**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1.     Paragraphs 1 through 21 and 32 through 40 of the General Allegations section of this Superseding Indictment are realleged and incorporated by reference as if fully set forth herein.

2.     From in or around July 2017, and continuing through in or around August 2020, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANGELICA PACHECO,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, the Insurance Plans, and to obtain, by means of materially false and fraudulent

15

pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs.

## PURPOSE OF THE SCHEME AND ARTIFICE

3. It was a purpose of the scheme and artifice for the defendant and her accomplices to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to health care benefit programs via interstate wire communications; (b) concealing the submission of false and fraudulent claims to health care benefit programs; (c) concealing the receipt of the fraud proceeds; and (d) diverting the fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## THE SCHEME AND ARTIFICE

4. The allegations contained in the Manner and Means section of Count 1 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## ACTS IN EXECUTION OR ATTEMPTED EXECUTION OF THE SCHEME AND ARTIFICE

5. On or about the dates as to each count set forth below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **ANGELICA PACHECO**, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program, in that the defendant submitted and caused the submission of false and fraudulent claims to the Insurance Plans seeking the identified dollar amounts, representing that the services listed below were medically necessary and actually provided:

16

| Count | Patient | Insurer | Approx. Claim Amount | Approx. Service Date | Provider Name | Claim No. & Description |
|---|---|---|---|---|---|---|
| 2 | B.W. | BCBS | $925 | 08/26/2019 | Florida Life | H100000763643482 (Evaluation & Management) |
| 3 | B.W. | BCBS | $2,200 | 08/26/2019 | Florida Life | H1000007642333338 (Partial Hospitalization Services) |
| 4 | J.M. | BCBS | $2,200 | 10/16/2019 | Florida Life | H100000773129842 (Partial Hospitalization Services) |
| 5 | M.M. | BCBS | $2,200 | 11/30/2019 | Florida Life | H100000782015575 (Partial Hospitalization Services) |
| 6 | M.M. | BCBS | $2,200 | 12/02/2019 | Florida Life | H100000782468113 (Partial Hospitalization Services) |

In violation of Title 18, United States Code, Sections 1347 and 2.

**COUNT 7**
**Conspiracy to Commit Wire Fraud**
**(18 U.S.C. § 1349)**

1. The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2. From in or around April 2020, and continuing through in or around May 2022, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANGELICA PACHECO,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with Individual 2, and with others known and unknown to the Grand Jury, to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

17

## PURPOSE OF THE CONSPIRACY

3.      It was a purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by:  (a) submitting and causing the submission, via interstate wire communication, of false and fraudulent PPP and EIDL loan applications, and material information and documents in support of those applications, to Lender 1 and the SBA, in order to make it appear that Florida Life qualified for PPP and EIDL loans, when it did not; (b) falsely and fraudulently representing to Lender 1 and the SBA that Florida Life was not engaged in any illegal activity, when in fact it was; (c) falsely and fraudulently representing to Lender 1 and the SBA that Florida Life's payroll expenses, number of employees, and gross revenue were higher than they actually were, in order to secure PPP and EIDL loans and to increase the amount of such loans awarded by Lender 1 and the SBA; (d) falsely and fraudulently representing to Lender 1 and the SBA that Florida Life would use the proceeds of the PPP loans solely for authorized expenses; (e) concealing and causing the concealment of these false and fraudulent applications; and (f) diverting fraud proceeds for their personal use, the use and benefit of others, and to further the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and her co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

4.      On or about April 2, 2020, **ANGELICA PACHECO** and Individual 2 submitted, and caused to be submitted, via interstate wire communications, an EIDL application in the name of Florida Life (the "EIDL Application").  The EIDL Application falsely represented, among other things, that Florida Life was "not engaged in any illegal activity." In addition, the EIDL Application falsely represented that Florida Life's gross revenues for the 12-month period prior to January 31, 2020, were $2,300,000.

18

5.    On or about June 11, 2020, **ANEGLICA PACHECO** and Individual 2 submitted, and caused the submission, via interstate wire communications, of an EIDL Loan Authorization and Agreement (the "EIDL Loan Agreement"), for the EIDL in the approximate amount of $150,000. The EIDL Loan Agreement falsely certified that "[a]ll representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

6.    As a result of the false and fraudulent EIDL Application, SBA approved the EIDL. On or about June 15, 2020, in reliance on false representations made in the EIDL Application and EIDL Loan Agreement, the SBA deposited approximately $149,900 into a corporate bank account ending in 3688 held in the name of Florida Life.

7.    On or about May 13, 2020, **ANGELICA PACHECO** and Individual 2 submitted, and caused the submission, via interstate wire communications, of a PPP loan application (the "PPP Loan Application") to Lender 1 in the name of Florida Life seeking a PPP loan in the amount of approximately $86,326 ("PPP Loan"). This PPP Loan Application falsely represented, among other things, that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law[.]"

8.    As a result of the false and fraudulent PPP Loan Application, Lender 1 approved and funded the PPP Loan. On or about May 15, 2020, Lender 1 transferred approximately $86,326 to a corporate bank account ending in 3688 held in the name of Florida Life.

9.    On or about February 1, 2021, **ANGELICA PACHECO** and Individual 2 submitted, and caused the submission, via interstate wire communications, of a PPP loan application to Lender 1 in the name of Florida Life (the "Second PPP Loan Application"), seeking an additional PPP loan ("Second PPP Loan") in the amount of approximately $86,326. This

Second PPP Loan Application, falsely represented, among other things, that "[t]he Applicant is not engaged in an activity that is illegal under federal, state or local law." In addition, the Second PPP Loan Application falsely represented that the Second PPP Loan's funds would "be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules." Further, the Second PPP Loan Application falsely represented that Florida Life had eight employees and an average monthly payroll of approximately $34,530.

10.    As a result of the false and fraudulent Second PPP Loan Application, Lender 1 approved and funded the Second PPP Loan. On or about February 10, 2021, Lender 1 transferred approximately $86,326 to a corporate bank account ending in 1999 held in the name of Florida Life.

11.    On or about May 23, 2022, **ANGELICA PACHECO** and Individual 2 submitted, and caused the submission of a loan forgiveness application to Lender 1 for the Second PPP Loan (the "Second PPP Loan Forgiveness Application") that falsely certified, among other things, that the Second PPP Loan proceeds were only used for "eligible" expenses, such as "payroll costs", when in fact **PACHECO** and Individual 2 spent much of the Second PPP Loan funds on unauthorized personal expenditures. In addition, this Second PPP Loan Forgiveness Application falsely stated that Florida Life had paid approximately $54,946 in payroll expenses from February 9, 2021, through July 26, 2021. As a result of this false and fraudulent Second PPP Loan Forgiveness Application, the Second PPP Loan was forgiven on or about May 31, 2022.

12. **ANGELICA PACHECO** and Individual 2 used the fraudulently obtained PPP and EIDL funds for unauthorized expenditures, including personal expenses, and unlawfully diverted the PPP and EIDL funds for their personal benefit.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 8
### Wire Fraud
### (18 U.S.C. § 1343)

1. The General Allegations section of this Superseding Indictment is re-alleged and incorporated by reference as if fully set forth herein.

2. From in or around April 2020, and continuing through in or around May 2022, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

### ANGELICA PACHECO,

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

### PURPOSE OF THE SCHEME AND ARTIFICE

3. It was a purpose of the scheme and artifice for the defendant and her accomplices to unlawfully enrich themselves by: (a) submitting and causing the submission, via interstate wire communication, of false and fraudulent PPP and EIDL loan applications for loans made available through the SBA to provide relief for the economic effects caused by the COVID-19 pandemic, including a PPP loan; (b) falsely and fraudulently representing that Florida Life's payroll expenses,

21

and number of employees, and gross revenue were higher than they actually were, in order to secure forgiveness for the PPP loan; (c) falsely and fraudulently representing that Florida Life used the proceeds of the PPP loans solely for authorized expenses; (d) concealing and causing the concealment of these false and fraudulent applications; and (e) diverting fraud proceeds for their personal use, the use and benefit of others, and to further the fraud.

## THE SCHEME AND ARTIFICE

4.    The allegations contained in the Manner and Means section of Count 7 are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## USE OF WIRES

5.    On or about May 23, 2022, in Miami-Dade County, in the Southern District of Florida, and elsewhere, **ANGELICA PACHECO**, and Individual 2, for the purpose of executing and in furtherance of the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, that is, the Second PPP Loan Forgiveness Application for the Second PPP Loan to Lender 1, in violation of Title 18, United States Code, Sections 1343 and 2.

## FORFEITURE ALLEGATIONS

1.    The allegations of this Superseding Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant **ANGELICA PACHECO** has an interest.

2.    Upon a conviction of a federal health care offense in violation of Title 18, United States Code, Sections 1343, 1347, and/or 1349, as alleged in this Superseding Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is

22

derived, directly or indirectly, from gross proceeds traceable to the commission of such offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in this Superseding Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C).

All pursuant to Title 18, United States Code, Sections 982(a)(7) and 982(a)(2)(A), and the procedures set forth at Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

FOREPERSON

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

LORINDA LARYEA
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

JAMES V. HAYES
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

AISHA SCHAFER HYLTON
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

CASE NO.: 24-20253-CR-BECERRA(s)

v.

ANGELICA PACHECO,

_____ /

### CERTIFICATE OF TRIAL ATTORNEY

**Superseding Case Information:**
New Defendant(s) (Yes or No) No
Number of New Defendants   0
Total number of new counts   0

**Court Division** (select one)

- [✓] Miami
- [ ] Key West
- [ ] FTP
- [ ] FTL
- [ ] WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect:_____

4. This case will take   15   days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I   [ ]   0 to  5 days
   - II  [ ]   6 to 10 days
   - III [✓]  11 to 20 days
   - IV  [ ]  21 to 60 days
   - V   [ ]  61 days and over

   (Check only one)
   - [ ] Petty
   - [ ] Minor
   - [ ] Misdemeanor
   - [ ] Felony

6. Has this case been previously filed in this District Court? (Yes or No) Yes
   If yes, Judge Jacqueline Becerra          Case No. 24-20253-CR-JB
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No._____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No._____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
ʄ⟋ JAMES V. HAYES
DOJ Trial Attorney
SDFL Court ID No.   A5501717

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name: _____ ANGELICA PACHECO _____ __ _____

Case No: _____ 24-CR-20253-BECERRA(s) _____ __ ____ ____.

Count #:   1

___ Title 18, United States Code, Section 1349 _____

___ Conspiracy to Commit Health Care Fraud and Wire Fraud _____ ____
* Max. Term of Imprisonment:   20 years
* Mandatory Min. Term of Imprisonment (if applicable):   N/A
* Max. Supervised Release:   3 years
* Max. Fine:   $250,000 or twice the gross gain or loss from the offense _____

Counts #:   2 – 6

___ Title 18, United States Code, Section 1347 _____

___ Health Care Fraud _____ ____ ____
* Max. Term of Imprisonment:     10 years as to each count
* Mandatory Min. Term of Imprisonment (if applicable):     N/A
* Max. Supervised Release:   3 years
* Max. Fine:     $250,000 or twice the gross gain or loss from the offense _____

Count #:   7

___ Title 18, United States Code, Section 1349 _____

___ Conspiracy to Commit Wire Fraud _____
* Max. Term of Imprisonment:   10 years as to each count
* Mandatory Min. Term of Imprisonment (if applicable):     N/A
* Max. Supervised Release:   3 years
* Max. Fine:     $250,000 or twice the gross gain or loss from the offense _____

*Refers only to possible term of incarceration, supervised release and fines.   It does not include
restitution, special assessments, parole terms, or forfeitures that may be applicable.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

Defendant's Name: **ANGELICA PACHECO**

Case No: **24-CR-20253-BECERRA(s)**

Count #:   8

Title 18, United States Code, Section 1349

Wire Fraud

* **Max. Term of Imprisonment:   10 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

---

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**